412 A.2d 139

**James A. MORRIS, Appellant,**

v.

**Jean L. MORRIS.**

Superior Court of Pennsylvania.

Argued June 7, 1979.

Filed Oct. 5, 1979.

1. *See, Commonwealth v. Tyson*, 485 Pa. 344, 402 A.2d 995 (1979).

22

---

Warren R. Baldys, Jr., Williamsport, for appellant.

Robert J. Wollet, Williamsport, did not file a brief on behalf of appellee Jean L. Morris.

Before PRICE, GATES and DOWLING, JJ.*

PRICE, Judge:

This appeal calls into question the validity of certain conditions attached to appellant's visitation privileges granted concomitant to a decree confirming custody of a four-year old child in her natural mother, appellee. The salient facts are as follows.

James A. Morris, appellant, and Jean L. Morris (now Jean L. Maggs), were married on February 2, 1974, in a Roman Catholic ceremony. Lisa Marie Morris was born of this union on August 20, 1974. Prior to Lisa's birth, the parties had agreed that their children should be raised in the Roman Catholic Church, notwithstanding the fact that appellant was not himself Catholic. Despite this compact, appellant prohibited Lisa from being baptized a Roman Catholic as a consequence of his own subsequent conversion to the faith of the Jehovah's Witnesses. Nevertheless, the child was in fact later baptized without his knowledge.

The parties were separated on November 7, 1976, and divorced the next year. Custody of Lisa was maintained by the mother and mutually agreeable visitation rights were established. This status quo was amicably retained until April of 1978. At that time, the mother informed appellant that she objected to his taking Lisa to Sunday meetings and door-to-door solicitations on behalf of the Jehovah's Witnesses. Appellant ignored the complaint and Lisa's mother consequently denied him all visitation privileges. Appellant then brought this habeas corpus action in the Court of Common Pleas of Lycoming County. Following an evidentiary hearing conducted on August 10, and September 8, 1978, the Honorable Charles F. Greevy issued an order allowing appellant visitation rights every other weekend, but prohibiting him from taking Lisa on any door-to-door religious solicitations. Appellant now contends that this

* President Judge G. THOMAS GATES of the Court of Common Pleas of Lebanon County, Pennsylvania, and Judge JOHN C. DOWLING of the Court of Common Pleas of Dauphin County, Pennsylvania, are sitting by designation.

restriction violates his constitutionally guaranteed rights of privacy and to the free exercise of religion. We disagree and consequently affirm the order of the trial court.

It is well established that in all cases involving the custody of a child, the paramount consideration is the best interests and welfare of the child. *Trefsgar v. Trefsgar*, 261 Pa.Super. 1, 395 A.2d 273 (1978); *In re Custody of Neal*, 260 Pa.Super. 151, 393 A.2d 1057 (1978); *Commonwealth ex rel. Strunk v. Cummins*, 258 Pa.Super. 326, 392 A.2d 817 (1978); *Shoup v. Shoup*, 257 Pa.Super. 263, 390 A.2d 814 (1978). Although best interests is necessarily a nebular term, rendering itself amenable to neither simple definition nor application, it embraces the child's physical, intellectual, moral, and spiritual well-being. *Trefsgar v. Trefsgar, supra; Shoup v. Shoup, supra.* The generality of these factors and our reluctance to constrain the hearing judge by further defining them, is a recognition that in child custody cases, the court must abjure the simple solution of Solomon's Sword in favor of a "dispassionate and comprehensive analysis of all alternatives, to find what solution is indeed in the best interests of the child." *Commonwealth ex rel. Grillo v. Shuster*, 226 Pa.Super. 229, 233, 312 A.2d 58, 61 (1973) (footnote omitted). The variables may be complex and the evidentiary thicket exacerbated by emotional and antagonistic testimony, but we must continually hew to the pole star of a child's best interests, eschewing presumption and surmise.

Presently, we are convinced that embraced within the best interests concept is the stability and consistency of the child's spiritual inculcation. It would be an egregious error for our courts in a custody dispute to scrutinize the ability of the parents to foster the child's emotional development, their capacity to provide adequate shelter and sustenance, and their relative income, yet not review their respective religious beliefs. One need not concur with the biblical injunction that man's needs exceed the simple requirements of the body to acknowledge the impact of religious instruction. Quite apart from any concern with the child's spiritual

salvation—and we readily acknowledge the inadequacy of a legal forum to resolve which, if any, creed is superior in effecting that goal—it is beyond dispute that a young child reared into two inconsistent religious traditions will quite probably experience some deleterious physical or mental effects.

Of course, this conclusion merely begs the question of whether we are constitutionally capable of factoring religion into the best interests equation. Turning to that question,[1] both the weight of authority and established legal principles support the proposition that it is legitimate for a court to examine the impact of the parents' beliefs on the child.

We being with the fundamental premise that our citizens have been constitutionally guaranteed the right to hold any religious belief without interference from the state. U.S.Const. amend. I. Coupled with the fact that parents have traditionally been considered to have the primary, or natural, right to control their children's nurture, *see Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923),[2] there has been erected a

1. The courts of this Commonwealth have yet to directly address the constitutional issue involved. In *Commonwealth ex rel. Derr v. Derr*, 148 Pa.Super. 511, 25 A.2d 769 (1942), this court held that a mother was properly deprived of the custody of her two children because her activities as a Jehovah's Witness left little time to devote to the care of those children. In *Commonwealth ex rel. Kaufmann v. Kaufmann*, 69 Montg.Co.L.R. 292 (1953), the mother of a five-year old girl frequently took her daughter on day long proselytizing trips for the Jehovah's Witnesses. The court held that such actions demonstrated a blatant disregard for the child's welfare which necessitated an award of custody to the father.

2. As the Court noted in *Pierce*: "The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Pierce v. Society of Sisters*, 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925). Again, in the oft reiterated statement from *Prince*: "It is cardinal with us that the custody, care and nurture of the child reside first in the parents . . . ." *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944).

rampart of privacy about a child's spiritual development as formulated by his parents. *See* Pfeffer, Religion in the Upbringing of Children, 35 Boston U.L.Rev. 333 (1955). Nevertheless, while the adoption of a belief is absolutely protected, there exists only a qualified right to act on that belief. *Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1878). Thus, as our supreme court reiterated in *In Re Green*, 448 Pa. 338, 342, 292 A.2d 387, 389 (1972), *quoting Prince v. Massachusetts, supra*, 321 U.S. at 166–67, 64 S.Ct. at 442:

" 'But the family itself is not beyond regulation in the public interest, as against a claim of religious liberty. *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244; *Davis v. Beason*, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637. And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control by requiring school attendance [footnote omitted], regulating or prohibiting the child's labor [footnote omitted] and in many other ways [footnote omitted]. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds [footnote omitted]."

This also resolves the question of whether appellant has standing to base his objection on an infringement of his constitutional right to freely practice religion, when at first blush it appears only that Lisa is being deprived of her opportunity to engage in religious solicitation for the Jehovah's Witnesses. Apart from appellant's claim that his religious belief requires him to so educate his daughter the constitutionally protected right of a parent to control the religious education of his child has been implicitly recognized in a number of cases, as, for example, in allowing a suit by a parent in his own right to bar religious instructions in a public school attended by his children. *E. g., McCollum v. Board of Education*, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948). *See also, Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Prince v. Massachusetts, supra*.

Probably the most graphic example of this intrusion into a nominally sacrosanct area is the power of the state to order a blood transfusion for a critically ill child over the objection of his parents, typically Jehovah's Witnesses. *See, e. g., Application of President and Directors of Georgetown College Inc.*, 118 U.S.App.D.C. 80, 331 F.2d 1000 (D.C.Cir.), *cert. denied* 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964); *Jehovah's Witnesses in the State of Washington v. King County Hospital Unit No. 1*, 278 F.Supp. 488 (W.D.Washington 1967), *aff'd* 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968); *Re Sampson*, 29 N.Y.2d 900, 328 N.Y.S.2d 686, 278 N.E.2d 918 (1972) (per curiam) (discretion of court to order necessary surgery not limited to mortal illness); *In re Green, supra* (recognizing rule but refusing application because no evidence child's life was in immediate danger); *see generally* Annot. Infant—Compulsory Medical Care, 30 A.L.R.2d 1138. Similarly, in *Wisconsin v. Yoder, supra*, the Court recognized the power of the state to pierce the cloak of the familial unit, but held, employing a standard resembling strict scrutiny, that only those interests of the highest order might serve to permit the state such action, and that in that case, no collective interest of the state was gravely endangered by exempting small numbers of children reared by Jehovah's Witnesses from attendance at a public high school on religious grounds.

Appellant would have us accept these cases as support for the proposition that only under the most extreme circumstances, not here manifest, may the state weigh religious preferences. It is crucial to note, however, that in *Yoder, Green,* and similar cases, the state is attempting to intrude on a unified, nuclear family. In matters of custody, the family unit has already been dissolved, and that dissolution is accompanied by a weakening of the shield constructed against state intervention.[3] A parent cannot flaunt the

3. We note, however, that the inclination of courts to venture into religious questions when confronted with a custody dispute, in contrast with their reticence in fields other than custody, has been criticized by one commentator as a "flagrant abuse of the courts' power, and a clear infringement of parents' rights." Comment, Child

banner of religious freedom and familial sanctity when he himself has abrogated that unity. Consequently, the courts of this Commonwealth, in accord with those in other jurisdictions, have consistently held that while religious beliefs must not constitute the sole determinant in a child custody award, the court may consider those beliefs in rendering a decree. *Clift v. Clift*, Ala.App., 346 So.2d 429 (1977); *Allison v. Ovens*, 4 Ariz.App. 496, 421 P.2d 929 (1966), *cert. denied* 390 U.S. 988, 88 S.Ct. 1184, 19 L.Ed.2d 1292 (1968); *Frank v. Frank*, 26 Ill.App.2d 16, 167 N.E.2d 577 (1960); *Sinclair v. Sinclair*, 204 Kan. 240, 461 P.2d 750 (1969); *Quinn v. Franzman*, 451 S.W.2d 665 (Ky.App.1970); *Dean v. Dean*, 32 N.C.App. 482, 232 S.E.2d 470 (1977); *Commonwealth ex rel. Bendrick v. White*, 403 Pa. 55, 169 A.2d 69 (1961); *Commonwealth ex rel. Bankert v. Children's Services*, 224 Pa.Super. 556, 307 A.2d 411 (1973); *Commonwealth ex rel. Ackerman v. Ackerman*, 204 Pa.Super. 403, 205 A.2d 49 (1964); *Commonwealth ex rel. English v. English*, 194 Pa.Super. 25, 166 A.2d 92 (1960). *See generally* Pfeffer, Religion in the Upbringing of Children, 35 Boston U.L.Rev. 333 (1955); Note, Religion—A Factor in Awarding Custody of Infants? 31 S.Cal.L.Rev. 313 (1958); Annot., Religion as Factor in Awarding Custody of Child, 66 A.L.R.2d 1410. Indeed, the very concept of "best-interests" would be but a hollow shiboleth were not parental rights to yield to the welfare of the child. As we emphasize again, however, we neither intend to, nor are capable of, rendering a value judgment on the intrinsic truth of the varied religious beliefs, but confine our investigation solely to any detrimental effect their practice may have on the development of the child. We remain loath to tamper in such a delicate area, and while, as indicated by the standard developed *infra*, our review will be narrowly circumscribed, and action will not be taken on a record supported by mere conjecture, it is clear that such matters should and can be considered.

Custody: Best Interests of Children vs. Constitutional Rights of Parents, 81 Dick.L.Rev. 733, 739 (1977).

■ While the foregoing discussion has been primarily concerned with custody, these same considerations apply with equal force to matters involving visitation, or partial custody. *Spells v. Spells*, 250 Pa.Super. 168, 378 A.2d 879 (1977); *Gwiszcz Appeal*, 206 Pa.Super. 397, 402, 213 A.2d 155, 156 (1965) (emphasis in original) ("In any case involving visitation . . . *[t]he governing criterion must always be the welfare and best interests of the child.*"). Although the appellate courts of this Commonwealth have not grappled specifically with the issue of whether conflicting religious values should be considered in the context of visitation privileges, other jurisdictions have persuasively held that such an investigation is legitimate. In *Munoz v. Munoz*, 79 Wash.2d 810, 489 P.2d 1133 (1971), the father was a practicing Roman Catholic while the mother was a member of the Church of Jesus Christ of Latter Day Saints. Upon the divorce of the parents, the custody of their three children was awarded to the mother with visitation rights to the father. The lower court further held that exposure to conflicting religious beliefs would be detrimental to the children, and thus decreed sole control of their religious upbringing to be vested in the mother, specifically prohibiting the father from taking the children to any Catholic service or instructional class until subsequent court order or mutual agreement. The father alleged that this was not in the child's best interest, and the Washington Supreme Court affirmed the order with a modification. In justifying its decision, the court stated:

"Thus, the rule appears to be well established that the courts should maintain an attitude of strict impartiality between religions and should not disqualify any applicant for custody *or restrain any person having custody or visitation rights from taking the children to a particular church, except where there is a clear and affirmative showing that the conflicting religious beliefs affect the general welfare of the child.*" *Munoz v. Munoz, supra* at 813, 489 P.2d at 1135 (emphasis added).

The supreme court believed the lower court order overbroad, because no evidence, other than parental "speculation", was adduced that exposure to two religions had, or would potentially have, any adverse effect upon the children.

Several other state courts have echoed this rule of allowing the non-custodial parent to provide religious instruction for his child absent a showing of damage to the child's well-being. *See Goodman v. Goodman,* 180 Neb. 83, 141 N.W.2d 445 (1966); *Harris v. Harris,* 343 So.2d 762 (Miss. 1977); *Angel v. Angel,* 140 N.E.2d 86 (Ohio Com.Pleas 1956); *Robertson v. Robertson,* 19 Wash.App. 425, 575 P.2d 1092 (1978). In *Robertson,* the non-custodial father appealed a lower court order prohibiting him from taking his two sons to any meetings of the Jehovah's Witnesses, and from teaching or expressing to them certain religious doctrines. He contended, *inter alia,* that such an order infringed upon his first amendment privilege to the free exercise of religion. The Washington Court of Appeals vacated the restriction because the quantum of evidence demanded by the *Munoz* criterion was lacking:

> "[T]he record contains only the affidavit of Mrs. Caul [appellee] that the teachings of the Jehovah's Witnesses 'confuse and alarm [the] children' and 'have a detrimental and confusing impact upon [their] welfare' . . . . While we do not ignore the possible effect of a child's 'confusion' caused by exposure to different religions, *Munoz* . . . require[s] a *factual* showing, not mere conclusions and speculation[s]." *Robertson v. Robertson, supra* 19 Wash.App. at 427, 575 P.2d at 1093 (emphasis in original).

■ Appellant's brief here apparently accepts the rationale of these cases, but argues that no evidence was offered which indicated an immediate probability of harm to Lisa. Confronted with such a claim, it is necessary to carefully scrutinize the record for facts supporting the court's decision. Such an analysis is undertaken with the awareness that this court's scope of review in a custody dispute is of the broadest type, *Commonwealth ex rel. Spriggs v. Carson,*

470 Pa. 290, 368 A.2d 635 (1977); *In re Custody of Neal, supra,* and while we will not usurp the fact-finding function of the trial court, we are not bound by deductions or inferences made by the hearing judge from the facts as found. *Trefsgar v. Trefsgar, supra; Commonwealth ex rel. Ulmer v. Ulmer,* 231 Pa.Super. 144, 331 A.2d 665 (1974).

During the hearing, Paul T. Carstetter, an elder of the Jehovah's Witnesses congregation in Williamsport, testified that an active member of the congregation is expected to engage, to the extent of his ability and free time, in door-to-door solicitation and teaching. He stated that there is an absolute obligation on the part of the parents, devolving primarily on the father[4] and unaffected by divorce or separation, to inculcate the child into their religious belief. This education extends to the door-to-door solicitation:

"Q. [COUNSEL FOR APPELLEE]: Is it required of parents that if they undertake to do and become active and do door-to-door work, that they take their children with them?

A. [MR. CARSTETTER]: It's a scriptural requirement and an obligation on the parent himself, between he and his God.

Q. Well, is it a requirement, specifically, that when a parent does missionary work, door-to-door work, that they take their child or children with them?

A. This is at the discretion of the parent and how they understand their responsibility.

Q. Okay. Do you understand that that is a responsibility of your church, that the parent must take the child with them on door-to-door missions?

A. Personally, yes.

Q. Do you feel that that is part of the teaching of Jehovah Witnesses?

A. Yes, sir." (N.T. 34–35).

---

4. Ephesians 6:4: "And, ye fathers, provoke not your children to wrath: but bring them up in the nurture and admonition of the Lord."

Appellant described the type of solicitation engaged in as follows:

"Basically, what we do is we prepare ourselves with the Bible and also the Watch Tarney Wake magazine, and we knock at an individual's home and an individual comes to the door and we ask them a little bit about the Bible. We try and start a conversation; usually we try and do it in a sense that it is a carefree conversation, one that does not bring any problems to the mind. But what we try and do is focus on the benefits of what this kingdom is going to bring to mankind. We see so much trouble and turmoil in the world today and we are just trying to share a little bit of happiness with people, from the Bible." (N.T. 9).

He testified that he believed it a religious requirement to raise Lisa as a Jehovah's Witness, and such a requirement included the door-to-door teaching. (N.T. 10). It was, further, absolutely necessary to Lisa's salvation and physical well-being:

"Q. [COUNSEL FOR APPELLEE]: Would it be fair to say that the harm that you foresee might be described in terms of harm to her eternal being and her soul; you do not envision harm to her physical well being?

A. [APPELLANT]: Her physical well being, that is her soul. Yes, I see if she was to be raised in Catholicism and believe it and fight against the truth about the Bible, she would lose her life.

Q. That is the only harm that you see that—I think you have generalized it; I don't mean you have to give it in detail, but that's the type of harm you see?

A. Well, there could be.

Q. You don't see her being involved in an emotional trauma; you don't see her being involved in physical damage to her body as a result of that, do you?

A. It's quite possible.

Q. Would you envision damage to her physical body because she believed in Catholicism?

A. I just mentioned to you that her life would be lost." (N.T. 19).

The critical testimony as to psychological damage was delivered by John H. Bone, a clinical psychologist, who examined Lisa for one-half hour some one month prior to the hearing. He testified that a child of Lisa's age would tend to adopt her parents' beliefs rather than form her own judgments, and that considerable inconsistency in the former would cause the child to disregard the teaching of either parent.

"Q. How might that [inconsistent beliefs] manifest itself in her daily relationship with people?

A. This could lead to a very irresponsible type of behavior. From the standpoint that if she gets to the point—if she conceives of regulations and morals and standards as being something that can be debated between two people as important as a mother and a father, then she is going to take lightly any regulation of any kind.

Q. And what, in your—in your opinion, would a period of contradictory teaching be contrary to the best interests of this child?

A. It would be definitely very contrary. The ideal situation would be to have the mother and father living together and teaching a consistent doctrine of one or the other. I'm not evaluating either Jehovah Witnesses' doctrine or Catholicism. But I do believe that the very fact that there is a difference, and there they are debating over it, and they are really fighting a battle over this child's mind.

. . . . .

Q. To the extent that the two religions have consistent moral values, Christian moral values, wouldn't the teaching of those, simultaneously by both parents, be expected to improve the child's overall moral outlook?

A. Not as long as there would be inconsistencies in addition to the consistencies, because this child is not at an age where she can arrive at conclusions by herself, conclusions that are based on perceptive thinking." (N.T. 56–7, 64).

He also testified that the door-to-door solicitations would probably, although not necessarily, result in some psychological impairment. (N.T. 61).

In the light of such testimony, we cannot conclude that the hearing judge erred in restricting visitation. Appellant would contend that the psychiatric testimony did not evidence sufficient probability of harm to the child, whether measured against the standard of *Munoz* or those developed in conjunction with the medical transfusion cases. *See In re Green, supra.* We do not agree. First, we reiterate that this question arises in the context of a custody dispute. The state is not extending an Orwellian eye into the private decisions of an intact family unit. Second, we cannot accept an argument that the absence of present harm constricts the court's power to act. Were this the case, we would have to allow the psychological harm to Lisa to progress to a mentally crippling point before action could be taken. With that damage a *fait accompli*, however, any remedial action would be marginally effective. For our purposes it may be unfortunate, but the state of the art in psychiatry is such that absolute certainty is not possible. Unlike the medical practitioner who can proclaim with reasonable medical certainty that a child will die if not provided with a blood transfusion, the psychiatrist treads in a cryptic area replete with uncertainty. Nevertheless, while we do not expect psychiatrists, or judges, to be prescient, in the absence of more accurate data we consider it necessary to carefully weigh their opinions on the future development of the child. Instantly, Mr. Bone testified that the inconsistent teachings would probably result in some mental disorientation to Lisa. We believe that this is sufficient to override any right appellant may have in draping the whole of his religious beliefs upon the child.

The order is, at any rate, quite liberal. Appellant is not prohibited from seeing Lisa,[5] nor from discussing his beliefs

5. This court has previously held that there exists in the non-custodial parent a right to visit a legitimate child subject to total denial only under the most extreme or unusual of circumstances. *Common-*

with her, but only from forcing her to accompany him on his door-to-door visits. Moreover, as with all custody orders, this is temporary in nature, *Friedman v. Friedman*, 224 Pa. 530, 307 A.2d 292 (1973); *Commonwealth ex rel. Hickey v. Hickey*, 216 Pa. 332, 264 A.2d 420 (1970), and in the event of a change in circumstances, appellant would be entitled to seek an alteration of the conditions.

Order affirmed.

*wealth ex rel. Peterson v. Hayes*, 252 Pa.Super. 487, 381 A.2d 1311 (1977); *Lotz v. Lotz*, 188 Pa.Super. 241, 146 A.2d 362 (1958), *aff'd* 396 Pa. 287, 152 A.2d 663 (1959). Thus, we have granted visitation to parents who have engaged in marital misconduct, ignored and failed to support their children, and even to those whose children did not wish to see them. *Commonwealth ex rel. Peterson v. Hayes, supra*, 252 Pa.Super. at 490, 381 A.2d at 1312–13. For a discussion of whether the non-custodial parent has a true "right" or merely a "claim" to visit his child, *see* Henszey, Visitation by a Non-Custodial Parent: What is the "Best Interest" Doctrine?, 15 J. Family L. 213 (1977).