**Berger v. Berger**

C.P. of Monroe County, no. 592 D.R. 1989.

*Peter C. Layman,* for plaintiff.
*Jeffrey J. Kash,* for defendants.

WALLACH MILLER, *J.,* May 24, 2000—The issue presently before the court concerns the custody of Kyle Adam Berger, born July 23, 1989. The contestants in this custody dispute are Kyle's maternal grandmother, Gloria Muller and Kyle's natural father, John Berger. Kyle's natural mother is Amy Berger. Amy was not an active participant in these proceedings, and any reference to "the Bergers" herein refers to Father and his wife Cindy Berger.

Father and Amy married on March 26, 1988 and separated soon after Amy gave birth to Kyle. Amy left the marital residence and moved in with her former husband. Sixteen days after Kyle's birth, on August 8, 1989, Father filed a custody complaint requesting shared custody of Kyle. Following a master's conference on September 1, 1989, another judge of this court confirmed the recommendation of the master granting primary physical custody of Kyle to Amy. Father was granted visitation of baby Kyle on Mondays and Wednesdays from 1 p.m. until 4 p.m. Father later discovered that Kyle was not living with Amy, but rather with her mother, Gloria Muller. On July 11, 1991, Father again filed a custody action naming Grandmother Muller and her husband as defendants, again seeking primary physical custody of

Kyle. Father's request was refused due to a pending protection from abuse petition filed against Father by Amy. Following a hearing, the court dismissed the PFA petition.

On December 9, 1991, Father again requested primary physical custody of Kyle and following a master's hearing, this court affirmed the master's recommendation ordering Father and Amy to share physical custody of Kyle with Father having one overnight visit each week.

Father filed another custody action on October 18, 1993 requesting primary physical custody. Following a conference before the master, this court's order dated December 6, 1993 continued the parties' status of sharing physical custody with Father receiving additional partial physical custody two weekends a month and four weeks during the summer.

Father and Amy divorced on March 21, 1995. On August 23, 1995, Father again petitioned for a modification of his custody rights, and on October 6, 1995, this court affirmed an agreement reached at a master's conference between the parties. The next year, on September 6, 1996, Father again filed a petition for modification of custody, this time naming Grandmother as an additional defendant and requesting primary physical custody of Kyle. Following a master's conference, by order dated October 23, 1996, this court issued an interim order expanding Father's partial physical custody to three weekends a month in addition to the four weeks in the summer. On January 12, 1998, Father petitioned for an evidentiary hearing to finally determine custodial rights. We heard testimony on May 27, 1998 and on June 24, 1998, after which the record remained open to re-

ceive a report of a therapist who was seeing Kyle. This report was never filed.

In the interim, Father met Cindy, his present wife, while they were employed together at Wordsworth, a residential school for troubled youths, and they were married Valentine's Day, 1999. Following the marriage, Father moved into Cindy's house where they currently live with Cindy's children, Krystal and Scott. In response to Father's relationship with Cindy, Grandmother filed a petition to have the court again reopen the record in this ongoing custody dispute to hear new testimony concerning Kyle's custody arrangement. Following a period of procedural delays, Grandmother and Father filed a joint motion to have the custody matter scheduled as a special trial. This court granted the parties' joint motion and the trial was conducted on February 29, 2000. We have reviewed all of the evidence presented and the relevant Pennsylvania law, and are now ready to again make a ruling on the issue of Kyle's custody.

It is well established in Pennsylvania law that in any case determining custody the court's paramount concern must be for the best interests of the child. *Charles v. Stehlik,* 560 Pa. 334, 340, 744 A.2d 1255, 1258 (2000); *Albright v. Commonwealth ex rel. Fetters,* 491 Pa. 320, 323, 421 A.2d 157, 158 (1980); *Wiseman v. Wall,* 718 A.2d 844 (Pa. Super. 1998); *R.A.R. v. T.M.,* 434 Pa. Super. 592, 644 A.2d 767 (1994); *Swope v. Swope,* 455 Pa. Super. 587, 591, 689 A.2d 264, 265 (1997); *Mumma v. Mumma,* 380 Pa. Super. 18, 21, 550 A.2d 1341, 1342 (1988), *allocatur denied,* 524 Pa. 629, 574 A.2d 70 (1990); *Morris v. Morris,* 271 Pa. Super. 19, 24, 412 A.2d 139, 141 (1979). The Pennsylvania courts have long held that in a custody dispute all other issues are deemed less

important than the child's physical, intellectual, moral, and spiritual well-being. *Walkenstein v. Walkenstein,* 443 Pa. Super. 683, 691, 663 A.2d 178, 182 (1995); *Campbell v. Campbell,* 448 Pa. Super. 640, 643, 672 A.2d 835, 836 (1996); *Dorsey v. Freeman,* 438 Pa. Super. 236, 652 A.2d 352 (1994); *R.A.R.,* 434 Pa. Super. at 594, 644 A.2d at 768; *Swope,* 455 Pa. Super. at 591, 689 A.2d at 265. Our Superior Court has recognized that "best interests is necessarily a nebular term, rendering itself amenable to neither simple definition nor application . . . ," *Morris,* 271 Pa. Super. at 24, 412 A.2d at 141, and has cautioned that "[t]he court in a custody dispute should avoid mechanical determinations and focus its analysis on a close scrutiny of all particular facts relevant to determining the child's best interests." *Wiseman,* 718 A.2d at 848. A court determining custody must pursue a broad inquiry into all of the pertinent facts and circumstances surrounding the contesting parties that could affect the child's well-being. *Costello v. Costello,* 446 Pa. Super. 371, 374, 666 A.2d 1096, 1098 (1995); *Andrews v. Andrews,* 411 Pa. Super. 286, 297-98, 601 A.2d 352, 357 (1991), *affirmed,* 533 Pa. 354, 625 A.2d 613 (1993). Finally, our Superior Court has held that a court determining custody must consider the relevant facts as of the time of the hearing, because the "primary concern in custody matters is not with the past but with the present and future." *Witmayer v. Witmayer,* 320 Pa. Super. 372, 382, 467 A.2d 371, 376 (1983). (citations omitted) The parties' past conduct is only relevant if it will produce an ongoing, negative effect on the child's welfare. *Id.*

Three types of custody disputes are recognized in Pennsylvania law: parent versus parent; parent(s) versus the Commonwealth; and parent(s) versus a third party.

*Cardamone v. Elshoff,* 442 Pa. Super. 263, 272, 659 A.2d at 575, 579 (1995). Any person who is not a natural or biological parent is deemed to be a third party for the purposes of settling a custody dispute. *Id.* at 272, 659 A.2d at 579-80. (citations omitted) In the instant case, the current custody dispute is between Kyle's father and Kyle's grandmother, so Kyle's grandmother is considered a third party. This is an important distinction, because in Pennsylvania the courts have held that in custody disputes between a biological parent and a third party "the parent has 'a prima facie right to custody,' which will be forfeited only if 'convincing reasons' appear that the child's best interest will be served by an award to the third party." *Id.* at 272, 659 A.2d at 580, citing *In re Hernandez,* 249 Pa. Super. 274, 376 A.2d 648 (1977); see also, *Charles,* 560 Pa. at 340, 744 A.2d at 1258; *Walkenstein,* 443 Pa. Super. at 687, 663 A.2d at 181; *Ellerbe v. Hooks,* 490 Pa. 363, 367-68, 416 A.2d 512, 514 (1980), and *Hockenberry v. Thompson,* 428 Pa. Super. 403, 407, 631 A.2d 204, 206 (1993). While a parent's prima facie right to custody is not to be interpreted as a property right in the child, it places a procedural burden of evidence on the third party to establish "convincing reasons" why the best interests of the child would be served by awarding custody to the third party. *Walkenstein,* 443 Pa. Super. at 687, 663 A.2d at 181. Our Superior Court has instructed us that:

"[E]ven before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the parent's side. What the judge must do, therefore, is first, hear all evidence relevant to the child's best interest, then decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the

third party's side." *Hockenberry,* 428 Pa. Super. at 407, 631 A.2d at 206; *Ellerbe,* 490 Pa. at 367-68, 416 A.2d at 514. (citations omitted)

Furthermore, this burden of proof applies to the third party regardless of whether the third party is related or unrelated to the child. *Cardamone,* 442 Pa. Super. at 274, 659 A.2d at 580. With the foregoing standards in mind, we now turn to the instant case.

Grandmother's status as a third party necessitates a threshold inquiry into whether she has standing to maintain a custody dispute. Standing is an issue with jurisdictional implications, because a person may only evoke the jurisdiction of a court to enforce civil rights if that person has a real interest in the subject matter or controversy. *Campbell,* 448 Pa. Super. at 643-44, 672 A.2d at 837. In custody disputes, the traditional principles of standing are modified because "the relevant analysis considers the relationship of the parties asserting standing." *Id.* While a third party usually lacks standing in a custody dispute absent a prior dependency adjudication, the requirement of standing is considered satisfied when the third party has gained in loco parentis status. *Cardamone,* 442 Pa. Super. at 275, 659 A.2d at 581; *Walkenstein,* 443 Pa. Super. at 687, 663 A.2d at 180. The term in loco parentis refers to a person who puts himself in the situation of assuming the obligations incident to the parental relationship without going through the formality of a legal adoption. *Cardamone,* 442 Pa. Super. at 275, 659 A.2d at 581. In the instant case, Gloria has obtained in loco parentis status concerning Kyle by virtue of the custody order dated October 23, 1996, which awards, inter alia, "shared legal custody" of Kyle to Father, Amy and Grandmother. Grandmother's in loco

parentis status is further supported by the fact that Kyle has been living in her household since 1991. Accordingly, Grandmother has satisfied the standing requirement, and we now turn to our determination of what would serve Kyle's best interests.

In *Costello,* our Superior Court held that a judge determining custody should consider the character and fitness of the respective parties, the type of home they can offer, and their ability to financially provide for the child. *Id.,* 446 Pa. Super. at 374, 666 A.2d at 1098; see also, *Burnett v. Verstreate,* 742 A.2d 700, 702 (Pa. Super. 1999) (court determining custody should evaluate each contestants' lifestyle, home environment, personal relationships, and contact with the child). Thus, we begin by analyzing the evidence presented concerning the character and fitness of the respective parties.

Grandmother is a large, formidable 56-year-old woman. She is retired. She lives in a house in Reeders, Pennsylvania, with her third husband Gregory Muller, whom she married on April 13, 1985. He is the owner of Muller Enterprises Inc. which is a machine shop. He is semi-retired. Grandmother takes periodic medications for her thyroid and a tachycardia condition, but is otherwise in good general health. Following graduation from high school, she earned an associate degree and she is certified as a medical assistant.

The Muller household appears to have a stable lifestyle, with a healthy dose of regimen somewhat balanced by the Mullers' semi-retired status. Grandmother has diligently held Kyle to a rigid schedule of daily activities, including set meal times and designated periods for Kyle to work on school homework. It is apparent that she spends as much time with Kyle as possible and

that she wants to participate in as much of Kyle's life as possible. In addition to mealtimes and family activities with Kyle, she takes an active interest in Kyle's personal activities. During the years that Kyle was a Cub Scout, she served as the leader for Kyle's den. Now that Kyle has become a Boy Scout, she is training to become his Boy Scout troop leader and, in addition, plans to accompany the troop on all camping trips. While Kyle was enrolled in a small, private school through second grade, she became an administrative assistant to the school's owner/director.

Kyle is doing well in school, earning mostly A and B grades on his recent report cards. We are troubled, however, by Grandmother's testimony that she is willing to periodically take Kyle out of school to join the Mullers for trips and vacations, often on very short notice. Kyle missed the first week of school last year to go with the Mullers to the Jersey Shore. Grandmother testified that she would not hesitate to take Kyle out of school again this year to go on another trip, even though as of our hearing, no trips had yet been finally planned and there were only three months of school left in the current school year.[1] While Grandmother insisted that the primary goal of the trips was to provide educational experiences for Kyle, on cross-examination she admitted that the timing of the trips is determined largely by the presence of certain types of fish to meet Mr. Muller's avid fishing interest.

---

1. Kyle told us in chambers that a fishing trip was planned to Costa Rica over the Easter holidays but Grandmother would neither confirm nor deny this.

Grandmother testified that she is committed to maintaining Kyle's mental and physical health, and her interest is apparent in the activities that she helps Kyle pursue, and in the meals that she prepares for him. Kyle enjoys a substantial diet at the Muller household, consisting of items such as pancakes, oatmeal, cereal, beef, pork, chicken, turkey, rice, noodles, potatoes, vegetables and desserts. Grandmother testified that Kyle enjoys swimming and cycling, and that he has recently begun to ski. We are concerned, however, by her apparent lack of concern for Kyle's weight problem, and that she may be acting to prevent Kyle from participating in team-oriented sports such as football, basketball, and soccer. She testified that Kyle had told her that his father had refused to permit Kyle to play in these sports. On cross-examination, however, Grandmother admitted knowing that Father did not refuse to allow Kyle to participate. Perhaps most revealing was her testimony that she does not "subject" Kyle to football or soccer. Grandmother's "subjected to" phrasing is consistent with Father's assertion that she has prevented Kyle's participation by refusing to give Father the necessary permission forms and paperwork. We are also troubled by Grandmother's blasé dismissal of any suggestion that Kyle might benefit from therapeutic counseling, even though on at least one occasion Kyle has expressed a desire to commit suicide, and in the past has been violent and self-abusive.

From the testimony and evidence presented at our hearing, it is clear that Grandmother is devoted to Kyle and that she will go to great lengths to spend time with him and to ensure that all of his material needs are satisfied. This was best expressed by Wanda Lasher, the wife of Grandmother's first husband, who first testified on

behalf of Father but changed sides and later testified on behalf of Grandmother. In her words: "Gloria's there for Kyle's every want and need."

The court-appointed psychologist, Dr. John Abbruzzese, found that Grandmother was a generally well-adjusted person and that she has a high capacity for tolerance and open-mindedness. Dr. Abbruzzese's evaluation, April 21, 1998, defense exhibit 4. Although Dr. Abbruzzese found that Grandmother's sense of self-worth may at times be overly dependent upon others, he concluded that she appears to have the necessary qualities to be a loving and caring parent who will keep Kyle's well-being as her primary goal. *Id.*

Father is 35 years old and following his graduation from high school he has worked a variety of jobs, most recently at Wordsworth School as a maintenance employee. He has been active in the Army National Guard for over eight years and he has attained the rank of sergeant. Although he was unemployed as of our hearing, his former supervisor testified that Father's layoff in January of 2000 was merely part of an overall staff reduction at Wordsworth and was not a reflection on Father's performance. The supervisor also related that Father had always conducted himself professionally during the three years that they had worked together. Father testified that he is actively seeking new employment, and that he is confident he will soon find a suitable position. He married Cindy on February 14, 1999, and the Bergers live together in a house along with Cindy's children Scott and Krystal. Father testified that he takes no regular medications and that he enjoys generally good health.

The Berger household appears to have a healthy and stable lifestyle, with a busy pace that is normal for mod-

ern families. Father and Cindy apply firm but fair discipline standards to encourage adherence to the family's rules, and the standards and rules apply equally to Kyle, Scott, and Krystal. The Bergers have developed non-violent discipline techniques, including taking away a privilege such as television viewing or a late bedtime. The disciplined child is then allowed to earn back the privilege through a period of good behavior.

Father shares many activities with Kyle, including building model airplanes, shopping, riding bicycles, and taking walks in the park. Father and Kyle also share some of the family chores such as raking leaves and doing yard work. Although Father's commitments to each of the members in the Berger family have lessened the amount of time that he spends with Kyle alone, the Berger family environment allows Kyle to also share time with Father in conjunction with Cindy, Scott, and Krystal. Last year the Bergers brought Kyle, Scott, and Krystal to the Philadelphia Zoo, and the family went on a summer vacation trip to Disney World. Father takes an active interest in Kyle's school performance, activities, and Boy Scout events, and Father testified that only communication problems between himself and Grandmother have prevented him from becoming even more involved with Kyle's life.

The Berger's commitment to maintaining Kyle's physical and mental health is evidenced by their concern about Kyle's weight problem. The Bergers point to the 10-year-old's 38-inch waist size, and assert that Kyle cannot run even one hundred feet without being out of breath. The Bergers generally serve low-fat meals such as turkey burgers, chicken, calzones, grains, fresh vegetables, and pasta dishes. In addition, the Bergers en-

courage Kyle's involvement with activities and sports that will help Kyle to exercise. Father and Cindy are very active in karate activities, and they have encouraged Kyle to become involved, stressing that it will help Kyle to develop physical strength, self-respect, and mental discipline. Father testified that he supports Kyle's participation in team sports such as football, basketball, or soccer, and that he is willing to reschedule his karate activities in order to ensure that Kyle may pursue team sports.

Both of the Bergers agree that Kyle would benefit from receiving therapeutic counseling, and it was Father who arranged for Kyle to receive counseling following Kyle's expressed intention to consider suicide. The Bergers testified that Kyle can be disrespectful and selfish to people around him, and that Kyle's attitude usually improves after he has been with the Bergers for a few days. The Bergers stress an environment of mutual respect in their household, and they have sought to adjust Kyle's behavior through use of non-violent discipline, in addition to teaching Kyle improved communication skills.

It is clear from the evidence and testimony that Father sincerely loves Kyle, and is committed to taking the steps necessary to ensure Kyle's intellectual, physical, and moral well-being. Father has worked to improve the quality of his life so that he may provide Kyle with a healthy parenting environment. The court-appointed evaluator Dr. Abbruzzese found that Father enjoys the company of children, and that he gets a great deal of emotional support from being a father. Dr. Abbruzzese's evaluation, April 21, 1998, defense exhibit 4. Although Dr. Abbruzzese found that Father's communication skills are somewhat limited, and that he may have trouble effectively dealing with disciplinary issues, the doctor con-

cluded that Father "understands the appropriate roles of both parents in rearing children," and that "Mr. Berger is apparently attempting to offer the best he can for the welfare of Kyle Adam." *Id.*

Both parties agree that many of the problems that have arisen concerning the shared custody of Kyle are the result of the parties' collective inability to communicate without recrimination or acrimony. Father testified that Grandmother regularly fails to provide him with important paperwork that Kyle brings home from school, such as grade report cards and permission slips to allow Kyle's participation in team sports. He also testified that she often does not give him any advance notice of upcoming important events in Kyle's life, which has caused him to miss some of Kyle's proudest moments due to scheduling difficulties. Grandmother testified that communications with Father have been very strained since she confronted him concerning Father's timing when picking up Kyle. Following a period when Father would arrive to pick up Kyle a little early or a little late while on his way home from work, she ordered Father to pick up Kyle at exactly 5 p.m., as specified in the custody order. Grandmother and Cindy both testified that they do not speak to each other. Grandmother, who refers to Cindy as "Cynthia," felt insulted by an informal introduction by Father over a year ago. There is no doubt in the court's mind that Kyle's best interests will be served by all of the adults in Kyle's life making a concerted and sincere effort to improve their overall communication skills and accept each other as an important person in Kyle's life.

Under *Costello, supra,* we next turn to an examination of the type of living environment that each of the

parties offers to Kyle. The Muller home is located in Reeders, Pennsylvania, and is a ranch style house situated on 12 acres of land. There are eight rooms including four bedrooms in the house, allowing Kyle to have his own bedroom. Outside the house there is an above-ground swimming pool and a tree house in a nearby tree. The only person living in the Muller house with Grandmother and Kyle is Gloria's husband, Gregory. Although Mr. Muller was not called as a witness, Grandmother testified that Kyle and her husband get along well. Kyle's natural mother, Amy, lives in a mobile home on the Muller property. Grandmother testified that while Amy visits Kyle, she is content to have Grandmother provide most of the care for Kyle, and that Amy's overall involvement with Kyle has been minimal. Amy did not testify nor was she represented by counsel.

The Berger home is located in Kunkletown, Pennsylvania, where Father and Cindy live with Scott, Krystal, and Kyle. There are two bedrooms available for the children, and Scott and Kyle are currently sharing a bedroom to allow Krystal to have her own room. During our in-chambers talk with Kyle, he indicated that he did not mind sharing a bedroom with Scott. Nonetheless, Father testified that the Bergers have a full-sized basement that is clean, dry and finished, and that they are considering installing a new bedroom for Kyle in the basement.

Because of the closeness of the Berger family unit, it is important that we also analyze Kyle's relationship with Cindy, Scott, and Krystal. Cindy is a teacher certified to work with seriously emotionally disturbed children. She has a black belt in karate, and she places a high value on respect for others, as well as on the emotional and physi-

cal well-being of her family. She does not impress us as being easily intimidated. Although it has taken a while for Kyle to feel comfortable around Cindy, their relationship has grown stronger over the year since she and Father were married. During the Berger's Disney vacation, Kyle referred to Cindy as "mom." Cindy has accepted Kyle into her family, and she testified that she treats Kyle the same as her own children.

Scott is 7 years old, and is an autistic child who has had periodic outbursts of screaming and hyperactive behavior, although Cindy testified that Scott appears to have outgrown these problems in the last nine to 10 months. Father and Cindy testified that Kyle has taken on a role as a big brother to Scott, and that both children have benefited from the relationship. Scott has become more stable, and Kyle has increased his ability to share while gaining satisfaction from helping with Scott's development. Krystal is 11 years old, and her relationship with Kyle is characterized as being normal for young siblings of the opposite gender. Kyle and Krystal often tease each other and argue, but just as often the two are playing together amicably or sharing the television.

Under *Costello, supra,* we next need to analyze the parties' ability to financially provide for Kyle's well-being. The Mullers appear to be very comfortable financially. The Bergers are facing some current financial challenges due to Father's layoff. In addition, Cindy was terminated from her full-time teaching position at Wordsworth due to budget cutbacks that caused Wordsworth to terminate their entire teaching staff. Nonetheless, the Bergers testified that they are "making ends meet," because Father is collecting unemployment insurance and Cindy is working in two schools as a

substitute teacher. Father and Cindy are both actively looking for new full-time work, and their respective job histories indicate that both should be successful in locating a suitable new position. In *Hernandez,* the court held that "[f]inancial discrepancies between the parents and a third party are not sufficient reason to deprive the parents of custody." *Id.,* 249 Pa. Super. at 299, 376 A.2d at 661. (citations omitted)

We now turn to an analysis of the parties' ability to provide a stable environment for Kyle, because the Pennsylvania courts have long recognized that "continuity and stability are important elements in a young child's development." *Witmayer,* 320 Pa. Super. at 382, 467 A.2d at 376; see also, *Hernandez,* 249 Pa. Super. at 296, 376 A.2d at 660; and *Fisher v. Fisher,* 370 Pa. Super. 87, 93, 535 A.2d 1163, 1166 (1988). Our Superior Court has held that "[i]n custody decisions the court must consider the importance of continuity in the child's life and the desirability of development of a stable relationship with established parental figures and known physical environment." *Wiseman,* 718 A.2d at 850, citing *Gerber v. Gerber,* 337 Pa. Super. 580, 487 A.2d 413 (1985). The *Hernandez* court also noted the importance of stability to a child's welfare, and held that it is always "essential to consider how long the child has spent with the third party." *Id.,* 249 Pa. Super. at 297, 376 A.2d at 660. Nonetheless, a court determining custody "must take into account all of the evidence, including the reasons why the child has been so long with the third party" because the Pennsylvania courts have consistently held that "the fact that a child has been away from a parent for a long time will not by itself defeat the parent's right to custody." *Hernandez,* 249 Pa. Super. at 297, 376 A.2d at 660, cit-

ing *In re Adoption of Farabelli,* 460 Pa. 423, 333 A.2d 846 (1975); *Bresnock v. Bresnock,* 346 Pa. Super. 563, 500 A.2d 91 (1985); *Commonwealth ex rel. Johnson v. Pinder,* 217 Pa. Super. 180, 269 A.2d 511 (1970).

In the instant case, Kyle has resided with Grandmother for over eight years, and she has created a stable living environment for him in her household. This is evidenced by Kyle's bedroom, which is stocked with many of his favorite items, including his television, VCR and video collection. Grandmother testified that Kyle has made friends in the neighborhood surrounding her home, and that he is happy in his current school. During our in-chambers conference, Kyle testified that he has stayed with Grandmother "for as long as I can remember" and that he is very happy living at the Muller home. Although he spends three weekends a month and four weeks in the summer with Father, shifting Kyle's physical custody to Father on a more permanent basis would bring changes in Kyle's lifestyle, and would disturb the continuity that Kyle has with the Mullers. A move into the Berger household will mean that Kyle will be living with a new family, in a different neighborhood, and attending a different school.

In *Farabelli,* the Pennsylvania Supreme Court affirmed the lower court's grant of custody to the child's natural father, despite the fact that the 8-year-old child had been living with her maternal grandparents since birth. *Farabelli,* 460 Pa. at 423, 333 A.2d at 846. The *Farabelli* court found that the father had remained in contact with the grandparents, had regularly contributed money towards his daughter's care, and had made major alterations in his lifestyle in order to regain custody of his daughter, which taken together defeated the

grandparent's assertion that the father had voluntarily relinquished his parental rights. *Id.* at 430, 333 A.2d at 850.

In *Bresnock,* our Superior Court affirmed the trial court's award of physical custody to the child's mother, rather than the paternal grandparents, after the child had lived with them in Frackville for about four years. During that time, Mother had moved to Pittsburgh after the child's father died and married her older daughter's father. The trial court found that the homes of both parties were adequate; that the mother's new husband had an adequate income; that mother provided a comfortable home; that the child and her half-sister got along well together; and that mother and new husband had a normal marital relationship. The trial court also found that mother's employment as a go-go girl and the violent and abusive relationship she endured with the child's father was in the past and not relevant to the current custody proceedings.

The facts in the instant case are very similar to those in *Farabelli* and *Bresnock,* because Kyle has resided with his maternal grandmother, Gloria, for eight years. In addition, Father overcame many obstacles to remain in contact with Kyle since Kyle's birth. Kyle was born on July 23, 1989. Just sixteen days later, on August 8, 1989, Father filed a custody action requesting shared custody of Kyle: a status that he eventually was granted, and which continues into this proceeding. Father has worked to improve his life to be more compatible with Kyle's best interests, and his marriage to Cindy has resulted in more stable living arrangements for Kyle and an opportunity for Kyle to experience a family environment with siblings.

We find that Father's ongoing interest and regular contact with Kyle during Kyle's life will mitigate the potential disruption in Kyle's stability caused by a transfer of primary physical custody to Father. In addition, Grandmother testified that several of the boys in Kyle's scout troop attend the same school that Kyle would attend if Father is awarded physical custody of Kyle. These familiar faces would help Kyle adjust to a new school environment. Also, even if Kyle were to remain in the school district he is in now, he will still change location, buildings and classmates this year, when he moves from fifth grade to sixth grade. Finally, under *Witmayer, supra,* we are reminded that the primary concern in custody matters lies not with the past, but with the present and future. Despite anything in the past, it appears that Father and Cindy are presently building a stable home that is likely to provide substantial continuity for Kyle in the future.

Another issue that needs to be addressed is the fact that Father and Grandmother belong to different religious faiths. Grandmother is of the Catholic faith, while Father is a Baptist. Our Superior Court has held that a determination of a child's best interests should include an analysis of "the stability and consistency of the child's spiritual inculcation." *Morris,* supra at 24, 412 A.2d at 141-42. Our inquiry into the religious issue does not involve any judgments concerning the relative worth of the two religious faiths, but rather is limited to considering what effect the disparity in the parties' faiths will have on Kyle's well-being. The *Morris* court explains that:

"It would be an egregious error for our courts in a custody dispute to scrutinize the ability of the parents to

foster the child's emotional development, their capacity to provide adequate shelter and sustenance, and their relative income, yet not review their respective religious beliefs. One need not concur with the biblical injunction that man's needs exceed the simple requirements of the body to acknowledge the impact of religious instruction. Quite apart from any concern with the child's spiritual salvation—and we readily acknowledge the inadequacy of a legal forum to resolve which, if any, creed is superior in effecting that goal—it is beyond disrepute that a young child reared in two inconsistent religious traditions will quite probably experience some deleterious physical or mental effects." *Id.* at 24-25, 412 A.2d at 142.

The *Morris* court carefully analyzed whether a custody court is constitutionally capable of factoring religion into the best interests determination, and concluded that the religion factor is permissible so long as the court is only analyzing the tangible effects on the child's well-being caused by the disparity in the contestants' faiths. *Id.* at 29, 412 A.2d at 146-47.

During our in-chambers conference, Kyle told us that he has been subjected to some uncertainty surrounding his religious faith, both because Grandmother and Father belong to different faiths, and because of their problems communicating with each other. Specifically, Kyle related that for a period of time Grandmother told Kyle to hide his Saint Jude's medal in his sneaker while visiting Father, because Kyle became convinced that Father did not like Catholics, even though he had married Cindy, who is Catholic. When Kyle finally showed his medal to his Father, Father told Kyle that he did not dislike Catholics, and that Kyle was free to pursue the religion

of his choice. Kyle told us that he is willing to keep an open mind concerning religion, and that although he thinks of himself as being Catholic, he is willing to accept that his father's religion is Baptist. It appears that Father and Grandmother have avoided using religious faith as a weapon against each other, and that each person's acceptance of the other's religious freedom will serve to minimize any potential negative effects on Kyle's well-being stemming from the contestants' religious disparity.

Finally, we turn to an analysis of the desires expressed by Kyle concerning his custody. While the express wishes of a child are not controlling in a custody dispute, Pennsylvania courts have consistently held that a child's wishes "constitute an important factor that must be carefully considered in determining the child's best interests." *Myers v. DiDomenico,* 441 Pa. Super. 341, 346, 657 A.2d 956, 958 (1995), citing *McMillen v. McMillen,* 529 Pa. 198, 202-204, 602 A.2d 845, 847 (1992). The Pennsylvania courts have noted, however, that the child's preference must be based on good reasons, and that the child's maturity and intelligence are factors that must be considered by the court when determining a weight to be accorded to the child's preference. *Cardamone,* 442 Pa. Super. at 278, 659 A.2d at 583; *Witmayer,* 320 Pa. Super. at 381, 467 A.2d at 376; *Albright,* 491 Pa. at 327, 421 A.2d at 160; *Myers,* 441 Pa. Super. at 346, 657 A.2d at 958; *Swope,* 455 Pa. Super. at 592, 689 A.2d at 266.

In the instant case, Kyle has expressed a desire to remain with his Grandmother, but several factors lead us to give little weight to this stated preference. First, Kyle is only 10 years old, and during our in-chambers conference, Kyle did not impress us as having obtained any

maturity beyond his years. To the contrary, Kyle's answers to the court's inquiries indicated that Kyle still has a great deal of maturing to do, and his responses appeared to be motivated by a desire to appease his Grandmother. It was apparent that Kyle was seeking to protect the limited security that he has thus far by not saying anything that might offend or endanger his ability to stay with the Mullers.

Further, during our in-chambers conference when we asked Kyle to explain his statement that he doesn't feel welcome at his father's house, Kyle responded: "because he hurts me." However, when Kyle was asked to explain how he was hurt, Kyle's only explanation was that one time Father thought Kyle was going to walk in front of an oncoming car, and he grabbed Kyle away, leaving a mark on Kyle's arm. When Kyle was asked who he admires most, Kyle stated that he wants to be like the Mullers because "they are cool . . . they do things that normal people don't do," such as fishing and travel. As might be imagined, Kyle particularly likes the fact that the Mullers are willing to take him out of school to travel with them. These responses indicate that Kyle has not yet developed a broad enough perspective for us to accord much weight to his preference, and that Kyle is still unable to perceive that some experiences which are not particularly enjoyable are often the most important for a person to become healthy, balanced, and educated. We saw Kyle twice, a year apart. In our first interview, he was rude, arrogant, flippant and not a very likeable kid. In our second interview, a year later, he was less arrogant but still not focused and could not give us any intelligent or reasonable explanations for a lot of his statements. He would talk about one thing and suddenly

switch to another. In his report, our court-appointed psychologist found that "Kyle had found himself in a position of control and possible manipulation." Dr. Abbruzzese's evaluation, May 13, 1998, defendant's exhibit no. 4. Further, Dr. Abbruzzese suggested "that Kyle may benefit by having a person available to him who may assist him in objectively reviewing his feelings and assisting him further in coping with the struggles within his total family relationship."

Having reviewed all of the testimony and evidence presented, we conclude that both Grandmother and Father possess the character and fitness to fulfill parental responsibilities for Kyle. Both parties have the financial ability to provide for Kyle, and both parties reside in a stable home with adequate space to provide a suitable living environment. Both care for him and share many activities with him. Although Grandmother currently enjoys more financial stability, and has had Kyle living with her for over eight years, Father has remained in constant contact with Kyle over his lifetime and is presently able to offer him a stable family environment.

We find that Kyle's interests would be well served by an award of physical custody to either party, however, under the law of our Pennsylvania appellate courts that we have researched and cited, we hold that Grandmother has not established sufficiently convincing reasons to satisfy the heavy evidentiary burden placed on her as a third party challenging a natural parent for custody. John Berger is Kyle's natural father, and accordingly, John's prima facie parental rights mandate that he be awarded primary physical custody of Kyle. We also find, after a review of all of the evidence presented, that it would be in Kyle's best interest to be with his Father. For the fore-

going reasons, we hold that primary physical custody of Kyle is to be transferred to his Father, John Berger.

We further find that the conduct of the parties and others involved in the case during this transition will be critical to Kyle's well-being. The tension between Grandmother and Mrs. Lasher, Kyle's step grandmother, on one side, and the Bergers on the other side was very apparent in the courtroom. We remind everyone that Kyle is not a prize to be won. Recent national events have made the general public aware of the family politics that are part and parcel of every custody matter that our courts hear. It must be remembered that Kyle's self-respect and his respect for others will be learned by his watching those around him. This transition can occur with the adults taking the high road of civility or they can continue the petty behavior that has hung over Kyle's head all these years. Only one thing is certain, Kyle will be watching and listening to it all.

## ORDER

And now, May 24, 2000, it is ordered as follows:

(1) Primary custody of the minor child, Kyle Adam Berger, shall be with his Father, John Berger, Jr.;

(2) Grandmother, Gloria Muller, shall have partial physical custody the second weekend of each month from Friday after school until Sunday evening at 7 p.m. during the school year and from noon on Friday until 9 p.m. Sunday during the months of July and August. In the event Father's Day occurs during the second weekend in June, then she shall have partial physical custody the third weekend of that month. Nothing in this order shall be construed to mean that Kyle cannot participate

in activities or sports during these periods of Grand-mother's partial physical custody;

(3) Grandmother shall also have one week of partial physical custody each summer. Grandmother shall give at least thirty (30) days notice of the week selected to Father in writing. In the event that Kyle attends a one-week Boy Scout camp and Grandmother attends as his scout leader, this shall not constitute her period of partial physical custody;

(4) Kyle shall complete fifth grade in his present school;

(5) This order shall supersede all previous orders in this case.