J-A14038-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| KIMBERLY L. HORN, N/K/A KIMBERLY L. ZAPERT, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WILLIAM A. HORN | : | |
| | : | No. 172 MDA 2022 |
| Appellant | : | |

Appeal from the Order Entered December 30, 2021
In the Court of Common Pleas of Tioga County Civil Division at No(s):
0085-FS-2018

BEFORE:   BENDER, P.J.E., STABILE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:        **FILED: JULY 5, 2022**

Appellant/Father William A. Horn appeals from the Custody Order entered in the Court of Common Pleas of Tioga County on December 30, 2021, following a custody trial granting Appellee/Mother Kimberly L. Horn, N/K/A Kimberly L. Zapert primary physical custody and Father periods of supervised physical custody of the parties' three minor children: M.H. (born 2005); B.H. (born 2008); and A.H. (born 2011) (collectively referred to herein as "Minor Children"). The parties also were awarded shared legal custody of the Minor Children and required to participate in reunification therapy.

Recognizing that while there appears to be no physical risk of harm to the Minor Children if supervised visits were discontinued but also recognizing testimony indicates there remains a mental and emotional risk of harm to the

_____

[*] Former Justice specially assigned to the Superior Court.

older children if supervised visits were discontinued, following a careful review, we affirm the Custody Order and the well-reasoned opinion of the Honorable George W. Wheeler.

The instant appeal arises from the latest proceeding in an acrimonious and litigious custody matter between Mother and Father. The parties were married on August 1, 2006, and a divorce decree was entered on October 13, 2020. Relevant to the instant appeal, Mother filed a Petition for Protection from Abuse ("PFA") on April 18, 2018, wherein she sought a protective order for herself and the Minor Children, and a temporary PFA order was entered that day.

A hearing on the PFA was scheduled for August 3, 2018, and on that date the parties entered into a stipulation which, *inter alia*: vacated the temporary PFA order; dismissed the PFA; provided Mother and Father shared legal custody of the Minor Children; and provided Mother with primary physical and Father partial, supervised custody of the Minor Children, with the caveat that M.H. and B.H. may choose not attend the supervised periods of custody.

On September 12, 2018, Father filed a Petition for Modification of Custody wherein he averred that supervision of his custody visits was no longer needed and requested that he be granted primary physical custody of the Minor Children. On November 29, 2018, the parties entered into a Temporary Agreement and Order wherein the parties would share legal custody, with Mother having primary physical custody. The Order further provided that Father would receive supervised partial custody with no set

schedule but specified that all three Minor Children were required to attend the custodial periods unless their counselors were to indicate in writing that it would be therapeutically harmful for any or all of them to attend such visitation.

On January 11, 2019, a guardian *ad litem* was appointed for all three Minor Children. Several motions filed by both Mother and Father and custody conferences were held thereafter, and additional Temporary Agreements and Orders followed.

Ultimately, a custody trial commenced on September 15, 2021, and the trial court entered its Custody Order and Opinion on December 30, 2021. Therein, the trial court made the following findings in support of its determination regarding custody of the Minor Children:

> 1 . Both parties exhibit an extreme level of distrust and animosity toward each other. The conflict is of such a degree that it is likely neither parent, if permitted, would support continuing physical contact with the other. Father is adamant and focused in his belief that all issues between the parties and the challenges that those problems present for the children are the result of a designed and Intentional effort by Mother to remove him entirely from the children's lives. Father seems to suggest that the proper remedy would simply be to grant him complete custody and exclude further interference by mother. Mother has maintained custody of the children for a period of nearly three (3) years. The children have only participated in supervised visitation sessions with Father during that time, Mother's conduct and demeanor towards Father strongly suggests that she wishes to minimize and control Father's contact to the maximum extent possible. It is noted that Mother is as adamant in her position that Father is entirely responsible for all current challenges as Father is in his counter position. Mother has suggested that contact between the children

and Father should be entirely supervised and perhaps avoided entirely until "the children are older."

2. There is no evidence that Mother has engaged in physical abuse of any of the children. There is evidence, in the form of testimony from Mother, and B.H., that Father, prior to the parties' separation in 2018, struck at least one (1) of the children, B.H. Father does not dispute that he struck the child but testified that he did so in the form of spanking as a form of discipline and not as abuse. Father was charged with harassment as a result of the incident and was found not guilty. Mother has repeatedly asserted in this proceeding, in contact with the GAL and with others. that Father struck B.H. so violently during this episode that he suffered a separated tailbone. According to mother, the child was seen at Geisinger Hospital in Danville for a previously scheduled appointment the following day, despite this no evidence in the form of medical testimony or record has been presented in any proceeding, nor, according to her report, to the GAL, to support this serious allegation. This matter, and several others, have been the subject of investigations all of which were determined to be unfounded.

There is testimony that at least the two (2) older children observed Father strike Mother prior to separation. Father denies this. Additionally, Mother and the children have reported that Father is loud and demeaning towards them at times including the use of threating language, inappropriate names and sarcasm. There is no evidence to suggest any acts of abuse by Father post-separation. Rather, evidence demonstrates that the numerous supervised visits between Father and the children have gone quite well. While an allegation of abuse regarding an event during a visit was investigated, it was ultimately. deemed unfounded. The supervision reports and the testimony of the custody supervisor make clear that physical safety has not been a concern during Father's, custody periods.

3. Post-separation, Mother has performed all parental duties on behalf of the children. Prior to separation, the evidence suggests that Father was active and that both parents actively participated in and shared parental duties, including assistance with school work, meals, transportation, and discipline.

4. All three (3) children are currently enrolled in the Wellsboro Area School District (WASD) and have been for at least a year and a half The children have developed friendships and connections

within their respective schools and are generally content. The children have expressed a desire to remain within the WASD and Wellsboro community. There have been academic struggles for the two (2) older children, which are being appropriately addressed. Additionally, at least B.H. receives additional support services through his school. Similarly, they are connected to and engaged in the Wellsboro community. The children have progressed socially and emotionally during their time in Wellsboro

5. Evidence related to extended family revealed that Father has a twin brother who resides within Tioga County and is known to the children. Father has a sister who resides in Pennsylvania several hours away, and Paternal Grandmother resides with her.

Mother's extended family includes her two (2) adult children, from a prior marriage, who reside outside of Pennsylvania. Her husband resides with her and the children in Wellsboro.

6. The children are clearly bonded with each other and express a desire to remain, together. They currently reside together with their mother, and Father's periods of supervised custody are scheduled to occur together.

7. Each child clearly expressed a desire to continue to reside with Mother. The two (2) older children have both requested the ability to "opt-out" of scheduled periods of custody with Father. Both currently do so at times, with the oldest, M.H., declining most opportunities for time with her father.

M.H. has, expressed fear of and anger and frustration with her Father. She feels Father refuses to accept or acknowledge any of his, past behaviors, which include allegations of abuse. She also feels Father minimizes the impact that the events occurring in the home have had on her and her sibling [sic]. Additionally, she expresses concern that Father has not "done his work" to address his anger and to work toward reunification. Also, she is aware that Father dismisses the appropriateness or necessity of her therapy. Further, M.H. is very aware of each of her parent's disdain of the other. M.H. at one point suggested that she would be content to have no contact with Father if she could so, choose but later made clear she is willing to see her father but would like to maintain a substantial amount of control over the same. M.H. is a bright, articulate young lady who seems to express herself comfortably, this observation is consistent with: the reports of others including therapists and the GAL. It is clear M.H. has thought extensively

about her relationship with her father and wants it to be better but feels that will require investment in the relationship and changes by her father.

B.H. also expressed some fear of and frustration with his father. B.H. as discussed above, is alleged, by Mother, to have suffered physical and verbal abuse by Father. B.H. reports these allegations to be true. Similar to his older sister, B.H. is frustrated that Father does not acknowledge any past conduct or a need for any change to be made by Father. B.H. likes the current custody arrangement whereby he sees his father for periods of supervised custody. He would like to have the option to refuse his Father's periods of custody. While B.H. is younger than his sister he is also well versed, likely too much so, in the hostility between his parents.

A.H., the youngest child, expresses that she wants to continue seeing her father, but does not want to live with him or stay at "his house". She does not express any fear of her Father or spending time with him.

8. Father insists that his children have been intentionally alienated from him by Mother's conduct since the parties separated. Father adamantly denies that he committed any acts of abuse toward any of the children or Mother. Father essentially suggests that none of the services provided to the children are necessary but rather are part of the "plan" being executed by Mother. Mother insists that Father is dangerous and, that all actions she has taken have been in response to her fears for her safety and that of the children. The children have clearly adopted this position. As noted elsewhere, the children are all aware of the hostilities and accusations each parent have and continue to make against the other. It is clear that during the time since the parties separated, the children, despite the security of a home with their mother, limitations on father's contact and access to services continue to struggle with fears related to their father and their relationship with him.

9. Father's current attitude and conduct strongly suggests that he would at times struggle, as the circumstances currently exist, to maintain a stable, consistent and nurturing relationship with the children, particularly M.H. and B.H. Specifically, Father insists that he has never perpetrated any abuse but rather is the victim of Mother's conduct. M.H. and B.H. are equally insistent that Father did engage in abuse and refuses to acknowledge doing so or take any steps to remediate it. Father clearly discounts the children

participating in individualized counseling and views it as unnecessary, whereas the children (particularly M.H. and B.H.) view it as vital to their well-being. Additionally, the older children both clearly indicated that Father says and does things which make them feel disregarded. B.H. recounted incidents where Father has mocked, stereotyped or otherwise belittled persons based upon their physical appearance or physical or mental limitation. B.H. reports Father continued to do this even when advised by B.H. that he did not believe it was appropriate and asked him to stop. M.H. recounted a recent visit when, after choosing to not to attend several periods of custody, she approached Father and he refused to acknowledge or speak to her. On a later visit, Father minimized M.H.'s excitement regarding her orthodontic braces which had just been placed.

10. Mother has demonstrated both the ability and willingness to attend to the physical, emotional, developmental, educational, and special needs of the children. Father similarly has demonstrated, prior to separation, the ability and willingness to meet the needs of his children. Subsequent to the separation, Father has struggled to engage with the service providers who have attempted to assist the family and the children individually. Father attributes this failure to others, noting that providers will not listen to him, that services being provided are not necessary, that providers misunderstand or misinterpret his conduct as hostile rather than frustration or that providers are not qualified to provide the services. Father demonstrates a complete refusal acknowledge any need of his, Children, absent an enthusiastic and unqualified acceptance, of his position that all of the experiences they have had, emotions they possess and the challenges they face are the sole result of Mother's alienation efforts. Father's hostility toward the appropriateness or need for services of any kind is concerning as it would likely have a significant impact on particularly to two oldest children.

11. The parties currently reside fifteen (15) to eighteen (18) minutes apart within Tioga County. Both maintain residences which are physically adequate to meet the needs of the children. While the parties reside in different school districts, both have adequate resources to provide any transportation to ensure custody can be, exercised as ordered.

12. Father operates, with his twin brother, a bushiness which produces glass tools. The primary physical facility is located in

Tioga Borough, Tioga County. Father testified that he has substantial flexibility to take time away from work to care for the children. Father reports he previously regularly transported the children to school and adjusted his schedule as necessary to meet the needs of the children. Mother works from home on a limited basis and reports she has availability to meet any childcare needs. Mother has, since separation, met all childcare needs for the children, including transportation to and attendance at medical and other appointments.

13. There is an extremely high level of conflict between the parties. Father attributes total responsibility for the parties separation to Mother, Further, he insists that Mother has deliberately alienated the children from him. Mother is equally insistent that all of her actions are intended to protect the safety of and advance the well-being of the children. This extreme level of conflict is known to the children and has been a significant impediment to their well being and the relationship they have with Father.

14. There is no evidence of drug or alcohol abuse by either party or any member of either household.

15. Neither party is limited as to their ability to care for the children by any physical or mental limitation. Mother suffers from Ehlers-Danlos Syndrome, as do two (2) of the children, but this does not substantially limit her ability to perform parental duties. Both parties underwent psychological evaluations which revealed no mental health condition that would prevent them from parenting the children.

16. Need for reunification therapy; Father retained Dr. Stanley Clawar to support to support his claim of parental alienation. Mother agreed to the use of Dr. Clawar and participated in the process. Dr. Clawar produced an extensive written report which was admitted at trial. He also testified for nearly a full day at trial. In considering the best interests of the children, which clearly includes maintaining and, if possible, strengthening the relationship between Father and each of the children, it is clear that an effort must be made at reunification. This determination is not an adoption by the Court of Father's espoused position that Mother has intentionally engaged in alienation, but rather is an acknowledgement of the reality that M.H. and B.H. are, in fact, significantly estranged from Father and likely will remain so

without a significant intervention. While A.H. is not yet similarly estranged, she is at risk to become so. This reality necessitates an attempt, through appropriate reunification therapy, to reunify the children and Father. The focus of this effort is not on the past but rather on the future. More importantly, it is not to be used as a process for fixing blame or accessing guilt or exacting a punishment or revenge, but instead to be a process to support the needs and interests of the children in restoring their relationship with Father. It is emphasized that both parents will be ordered to cooperate in the process, including any treatment recommended by the provider. Simply repeating or even screaming that alienation is at the root of all that is wrong between Father and the children will not be acceptable, nor may Mother, despite past attempts or failures in the effort, decline to participate. In an effort to maximize the potential for success, Father will be responsible for the initial selection of a qualified reunification therapist, he shall immediately notify Mother and the GAL of his selection.

Physical safety of the children. Substantial testimony was presented regarding concerns about the physical safety of the children in Father's care. Father has been accused of engaging in physical abuse of Mother and at least one of the children. Additional allegations have been made that Father has threated a neighbor and strangers in the driveway of the family home, has irresponsibly stored firearms with in the home, holds racist and/or white supremacist beliefs, has tortured animals, may have exposed the children, to pornography and other allegations. While the undersigned is well aware that many acts of abuse occur in private and are intended to be unobserved, it is of note that in this matter, despite the length of time to prepare for trial, the volume of material presented at trial and the serious nature of some of the allegations, little, other that her own testimony has been presented to support most of the allegations. For example, Mother has repeated that on at least two occasions, Father threatened others with a firearm on the property, including a neighbor, yet no one was presented to testify to either event. Further, as discussed above, Mother accuses Father of striking B. H. so violently that he suffered a separated tailbone yet no medical evidence has ever been presented to support the claim, despite the child being seen the very next day at Geisinger Hospital for a prescheduled appointment. Further, Mother testified to photographs she had taken, according to her testimony at the direction of Haven, to document the irresponsible storage of firearms within the home, however no such photos were presented. These allegations can not [sic] be merely disregarded

but must be balanced against the fact that Father has been repeatedly investigated for alleged abuse against the children and that all were determined to be unfounded. Additionally, there have been a significant number of supervised periods of custody and nothing from them suggests a threat to the physical safety of the children. What is clear is that the older two children have said they are uncomfortable with unsupervised visits at this time and this must also be considered. On consideration, visits will continue to be supervised at this time for M.H. and B.H. and they will be scheduled for alternating Mondays. A.IH. will have a supervised visit each Monday. On Mondays on which the visits are not scheduled to include M.H. and B.H., the visits with A.H. shall be in a public place within Wellsboro but shall not require supervision. M.H. and/or B.H. may at their sole discretion attend any of A.H.'s visits however their presence will be with the understanding that it will not otherwise change the conditions of the visit.

Trial Court Opinion, filed 12/30/21 at 1-9.[1]

_____

[1] "The Pennsylvania Child Custody Act ("the Custody Act"), 23 Pa.C.S.A. §§ 5321–5340, governs all custody proceedings commenced after January 24, 2011. **E.D. v. M.P.**, 33 A.3d 73, 77 (Pa.Super. 2011). The Custody Act requires a trial court to consider all of the Section 5328(a) best interest factors when "ordering any form of custody." 23 Pa.C.S. § 5328(a).

Soon after the current iteration of the Custody Act was enacted in 2011, this Court was tasked with interpreting Section 5323(d),"Reasons for award," and held that the trial court must delineate its reasons for its custody award prior to the deadline by which a litigant must file notice of the appeal. **See C.B. v. J.B.**, 65 A.3d 946, 954 (Pa.Super. 2013), *appeal denied*, 620 Pa. 727 (Pa. 2013). We reasoned that if the litigant were forced to take an appeal without the benefit of the trial court's rationale, then the litigant would be in an untenable position of having "to guess as to which information the trial court found pertinent, and how the evidence informed the court's analysis of the Act's sixteen custody factors." **Id.** at 955.

It is noteworthy that the trial court herein did not specifically cite to the sixteen, enumerated factors of Section 5328(a) in its December 30, 2021, Opinion and Order. Indeed, the court did not reference the Custody Act at all therein and instead merely refers to "the various factors set forth in the statute." **See** Opinion, filed 12/21/30, at 1. However, the trial court's decision to include sixteen (16) individually numbered paragraphs in its Opinion suggests an intent to mirror the sixteen subsections of Section 5328(a).

Father filed a timely notice of appeal on January 28, 2022. On that same date, Father filed a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b) wherein he presented sixteen (16) claims of error. The trial court entered its Supplemental Opinion Pursuant to Pa.R.A.P. 1925 on March 3, 2022.

In his appellate brief, Father raises the following Statement of Questions Involved for this Court's review:

> A. Whether the Trial Court erred or abused its discretion by continuing to impose upon Father a restrictive supervised visitation schedule in its final order when the Trial Court confirmed there was no evidence of record substantiating abuse or an ongoing risk of harm to the Minor Children?
>
> B. Whether the Trial Court erred and abused its discretion by issuing a final order based on the unreasonable and tainted preference of the Minor Children?
>
> C. Whether the Trial Court erred and abused its discretion by not considering and addressing the uncontroverted evidence of alienation on the part of Mother and its impact on the Minor Children's best interests?
>
> D. Whether the Trial Court erred and abused its discretion by issuing a final order based on the testimony of the guardian *ad litem* when the guardian *ad litem*'s report was not filed and she failed to conduct a proper investigation?

Brief for Father at 4.[2]

---

[2] Mother failed to file a timely appellate brief and, therefore, was precluded from participating in oral argument. The guardian *ad litem* was available at oral argument and responded to questions posed by the three-judge panel.

As Father's issues are interrelated, we will consider them together. In doing so, we begin with our scope and standard of review:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

With any child custody case, the paramount concern is the best interests of the child. This standard requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child. *J.R.M. v. J.E.A.,* 33 A.3d 647, 650 (Pa.Super.2011) (citation omitted).

*M.J.M. v. M.L.G.*, 63 A.3d 331, 334 (Pa.Super. 2013).

It is well-settled that in any custody case decided under the Custody Act, the paramount concern is the best interest of the child. *See* 23 Pa.C.S.A. §§ 5328 and 5338. Section 5328(a) of the Act sets forth the best interest factors that a court must consider in awarding custody. *See E.D. v. M.P.*, 33 A.3d 73, 79-80 n.2 (Pa.Super. 2011). Specifically, Section 5328(a) provides:

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

It is also axiomatic that:

> The record on appeal must clearly demonstrate that the trial court considered all of the factors listed in section 5328(a). **J.R.M. v. J.E.A.,** 33 A.3d 647, 652 (Pa.Super. 2011). Section 5323(d) provides that a trial court shall delineate the reasons for its decision on the record in open court or in a written opinion or order. Additionally, section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen section 5328(a) custody factors prior to the deadline by which a litigant must file a notice of appeal. ...
> In expressing the reasons for its decision, there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations. A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with section 5323(d).

**A.V. v. S.T.**, 87 A.3d 818, 822-23 (Pa.Super. 2014) (internal citations, quotation marks, and brackets omitted).

In addition to being aware of our deference to the trial court's credibility and weight of the evidence determinations, we are mindful that it is within the trial court's purview as finder of fact to determine which factors are most salient and critical in each particular case. **See M.J.M. v. M.L.G.**, 63 A.3d at 339. However, we will find error "where the trial court listed the Section

- 14 -

5328(a) factors but failed to apply them." ***C.A.J. v. D.S.M.***, 136 A.3d 504, 510 (Pa. Super. 2016) (citations omitted).

Section 5323 of the Custody Act provides for the following types of awards:

> **(a) Types of award.—**After considering the factors set forth in section 5328 (relating to factors to consider when awarding custody), the court may award any of the following types of custody if it in the best interest of the child:
>
> (1) Shared physical custody.
>
> (2) Primary physical custody.
>
> (3) Partial physical custody.
>
> (4) Sole physical custody.
>
> (5) Supervised physical custody.
>
> (6) Shared legal custody.
>
> (7) Sole legal custody.

23 Pa.C.S.A. § 5323(a).

Supervised physical custody is defined as "[c]ustodial time during which an agency or an adult designated by the court or agreed upon by the parties monitors the interaction between the child and the individual with those rights." 23 Pa.C.S.A. § 5322.

In circumstances where trial courts determine safety restrictions in a custody order are warranted:

> [i]t is important for courts to impose restrictions sparingly. ***See Ferencak v. Moore***, 300 Pa.Super. 28, 445 A.2d

1282 (1982). Courts ought not to impose restrictions which unnecessarily shield children from the true nature of their parents unless it can be shown that some detrimental impact will flow from the specific behavior of the parent. The process of children's maturation requires that they view and evaluate their parents in the bright light of reality. Children who learn their parents' weaknesses and strengths may be able better to shape lifelong relationships with them.

Once a court concludes that the imposition of a restriction is necessary, it must phrase the restriction in the least intrusive language reasonably needed to safeguard the child. *Somers v. Somers*, 326 Pa.Super. 556, 474 A.2d 630 (1984); *Dile v. Dile*, 294 Pa.Super. 459, 426 A.2d 137 (1981); *Morris v. Morris*, 271 Pa.Super. 19, 412 A.2d 139 (1979). Broad or nonspecific restrictions will be invalidated in favor of narrowly focused, precise restrictions that are directed toward the child's welfare. *Somers; Dile*. This principle underscores the policy that it is preferable for parent-child relationships to be defined by and developed according to the personalities and character of the child and parent, unhampered, to the extent possible, by restrictions imposed by the court.

*Fatemi v. Fatemi*, 489 A.2d 798, 801–02 (Pa.Super. 1985).

Furthermore, this Court has stated:

Although the express wishes of a child are not controlling in custody decisions, such wishes do constitute an important factor that must be carefully considered in determining the child's best interest. The weight to be attributed to a child's testimony can best be determined by the judge before whom the child appears. The child's preference must be based upon good reasons and his or her maturity and intelligence must also be considered.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa.Super. 2006) (internal citation and quotations omitted).

In his first two claims, Father avers the trial court erred when it imposed supervised visitation upon him in contradiction of its own findings and the record evidence. Father stresses the trial court found Father did not commit

any acts of abuse upon, nor did he pose any potential risk of harm to, the Minor Children.

Father argues that the trial court's Custody Order provides Father with several hours of physical custody of the Minor Children on Father's Day and other holidays and explicitly states that these custodial periods shall not be supervised. The court also excused supervised visitation with M.H. and B.H. in those instances when they to choose to attend a custodial session with Father and A.H. *See* Order, 12/30/21, at ¶ 3-4.

> Father opines that:
>
> When assuming the false premise that Father is a safety risk, there is no apparent or logical reason as to why the presence of A.H. or the occurrence of a holiday dissipates the need to protect the safety of the two oldest Minor Children. The Order terms show there is no rationale for the safety provisions that are related to abuse or potential harm to the minor children. It appears from the Opinion that the only reason the [t]rial [c]ourt continued supervised visitation was because of the Minor Children feeling uncomfortable: What is clear is that the older two children have said they are uncomfortable with unsupervised visits at this time and this must also be considered. On consideration, visits will continue to be supervised at this time. . ."

Brief for Appellant at 22-23.

Father also posits the trial court failed to consider evidence of Mother's historic alienation of him from the Minor Children and erred in basing its final Custody Order on the guardian *ad litem*'s trial testimony, because she had not filed a written report prior to testifying at trial.

In its Opinion filed pursuant to Pa.R.A.P. 1925(a), the trial court reiterates it "did not find that either party committed acts of physical abuse."

Supplemental Opinion Pursuant to Pa.R.A.P. 1925, filed 3/2/22, at 1. However, the court clarifies its decision to grant father supervised periods of physical custody of the Minor Children and its granting M.H. and B.H. the discretion to "opt out" of these custodial periods as follows:

> The court also granted the older children, who consistently and credibly express a fear of Appellant, great latitude in attending or not attending visits with their father. The testimony of these children indicates, credibly, that Appellant dismisses or ignores their expressed fears and concerns as well as, at least in the case of the oldest child, her very presence at some periods of custody. As discussed below, attendance at and participation in reunification therapy is not optional for the children nor either parent. The length, frequency and conditions of Appellant's periods of custody would all be subject to modification as progress is made in the reunification process.

Supplemental Opinion Pursuant to Pa.R.A.P. 1925(a) at 2 (unnumbered).

> An award of partial custody generally does not contain any restrictions. *Fatemi v. Fatemi*, 339 Pa.Super. 590, 489 A.2d 79 8, 801 (1985). "A restriction will be imposed if the parties have agreed to a restriction or if the party requesting a restriction shows that without it, partial custody will have a detrimental impact on the child." *Id.; see also* 23 Pa.C.S.A. § 5323(e) ("[I]f the court finds that there is an ongoing risk of harm to the child or an abused party and awards any form of custody to a party who committed the abuse or who has a household member who committed the abuse, the court shall include in the custody order safety conditions designed to protect the child or the abused party."

*J.R.M. v. J.E.A.*, 33 A.3d 647, 653 (Pa.Super. 2011).

Herein, Father's expert Dr. Stanley Clawar testified at the custody trial that based on his observations and interviews, while Father has work to do with professionals to help him "rethink a lot of his dialogue with the children," including active participation in reunification therapy, the continuation of

- 18 -

supervised visitation does not allow of Father's physical contact with the Minor Children to "normalize" and should not be a part of any future reunification plans. N.T., 11/18/21, at 194, 197, 222-223. Dr. Clawar explained that unsupervised visitation is:

> Often done in conjunction, in phases, and bigger blocks of time. So I've had work here where I've done a reunification session and then gone to the home with the father or mother, and the children. And so, it was a sequence into going out to dinner with or without, you know, somebody present and supervising. The question is, you know, does this person need supervision? What, to have dinner and then take the child home? Supervision to go to the arcade? So, I just raise questions about where and if, you know, supervision takes place. He's had three years of supervision, so you're looking for normalizing the relationship as much as you can. Will the reports be perfect? Probably not. Will kids come home and say: You know, Mom's annoying as hell or Dad was annoying at dinner? But is that abuse? No, it's not, it's the dialogue between the parent and the child where the kid just doesn't like something that was said. So, the goal here is to get rid of the microscope and to normalize it.

*Id*. at 223.

In addition, Attorney Patricia Shipman, the guardian *ad litem* for the Minor Children, testified extensively regarding her custody recommendation. N.T., 12/3/21, at 1-70. Attorney Shipman recommended continued supervised physical custody for Father of all three Minor Children, although she did not believe A.H.'s custody visits needed to be closely supervised. She explained that M.H. and B.H. would "benefit, very much, from having control over whether or not they see Father." *Id*. at 16. Attorney Shipman explained:

> I think B.F.H., in particular, likes to have the close supervision because of comments that Father makes that bother him. And I think M.J.H. does as well. Although I think M.J.H.'s

- 19 -

more emotionally able to handle those comments than maybe B.F.H. is. So, as far as physical, I would recommend that B.F.H. and M.J.H. get to choose when they want to go and that time continue with A.E.H. with kind of a looser supervision."

*Id*. at 17.

In making her recommendation, Attorney Shipman highlighted that while he is "amazing" and has improved greatly in the time she has known him, B.H. had been in a Partial Hospital Program, has gone to trauma therapy, receives medication, and sees both a psychiatrist and a psychologist. *Id*. at 27-28. She also was aware that B.H. had threatened suicide "at least once." *Id*. at 28. Attorney Shipman explained:

He has-he has times with his dad that are very, very good and he enjoys them very much. But there are times when his father says or does things that just upset him, and he is not able to- I think, initially, he wasn't able to even respond to that, now he has the insight to be able to say something to Dad. You know, this is- you say this or you do this and it upsets me, but Dad's response is not to accept that, and learn from it, and make changes. And so, he's still in the same place he was three years ago when I met him, which is he desperately wants to have a relationship with his father, and the relationship with his father is, is rocky- it's up and down- and his father continues to disappoint him.

*Id*. at 30.

With regard to M.H., Attorney Shipman expressed similar concerns of mental harm in support of her recommendation for supervised custody while at the same time recognizing that she desires to have a positive relationship with Father:

M.J.H. is incredibly depressed and anxious. Her entire body and- obviously, I haven't asked her to strip down-but her legs and her arms, like in the summertime when you can see that, are- her

entire body is covered in sores that she's self-inflicted, due to her anxiety and she's picked at them. She's created them and she's continued to pick at them. I don't know that she'll eve not- but they're always going to be visible because they're scarred so badly from that. She has a lot, a lot of dark feelings and hatred towards her father. . . . But, I, like, B.F.H., I've seen her grow and mature a lot. She's been able to work through a lot of those emotions and recognize them, understand them, talk her way through them, and control them. . . And, and I would say that despite- I think, actually, she wants a relationship with her father more than she would let on because even though she has not- she's had the freedom not to go to visits, where in six months she's chosen to go to a couple of them. . . .

-so, so her anger- her anger, from what I can tell, stems primarily from Father and her relationship with him, and her perception that she has been emotionally and verbally abused by him; and also probably witnessing him do the same to her mom and her brother, and treat her sister completely different.

*Id*. at 35-37.

Attorney Shipmen also noted:

They're very sensitive, sweet children, and Father can be very sarcastic, and I don't think they respond well to that. And they don't respond- they're not happy when they try to tell him things that's- they're not happy when they try to tell him things like, you know, that comment upsets me, and he just, you know, basically, laughs at them, or ridicules them, for being upset by that.

*Id*. at 38.

At the conclusion of her direct testimony, she stated that "unless and until" Father decides "to do the work that Mother and the children have done to move forward" she did not "see a lot of change in the physical custody schedule." *Id*. at 18. Attorney Shipman expressed her desire to see the

supervised visits transition to less "artificial interactions" going forward. Importantly, after noting Mother's displeasure with Dr. Clawar's report, Attorney Shipman looked favorably upon Dr. Clawar's recommendations for Mother and Father in general and specifically his recommendation for reunification therapy. *Id*. at 19.

However, Attorney Shipman also explained that eliminating the requirement of supervision for Father's custody visits at this juncture would be a "double-edge[d] sword:

> One is, I don't-I don't think that A.E.H. is unsafe with Father, I just don't. I think that- I don't think that the supervision, necessarily, provides her safety. But, I also think that A.E.H. feels safer with a supervisor, and that-and that if Dad is not doing the work that the children are doing and that Mom is doing, that going to unsupervised or lesser supervised is kind of going to- I don't know-let him get off without doing that work and not making any improvements, other than just having less supervision.

*Id*. at 46-47.

Following Attorney Shipman's direct and cross-examination, the trial court asked her if there were anything she did not believe had been addressed by counsel of which the court should be made aware. Attorney Shipman proceeded to give examples of the ways in which Father's testimony had been "full of a lot of lies and inconsistencies." *Id*. at 67.

Attorney Shipman also expressed her belief that the Minor Children want "very much to have a relationship with their father that makes them happy, that they feel safe with, and they have done everything that they feel like they've been encouraged to do for that to happen. And he has not." *Id*. at

She cited Father's refusal to move forward and instead focus on Mother's past alienation or behavior as the primary reason that little has changed in his relationship with the Minor Children for three years. *Id*. at 69-70.

Attorney Shipman stated the fact the Minor Children have precisely the same feelings and positions as they did when she met them three years prior proved to her that the children have not been coached or encouraged to say certain things due to some outside influence. She concluded by stressing that:

> And, I think, they've told you pretty much what they want and how they feel- and they've been thinking about that for three years at this point in time. And I respect their wishes, and I think that they should be taken into great consideration.

*Id*. at 70.

Although a trial court is not required to accept the conclusions of an expert witness in a child custody case, it must consider them, and, if the trial court chooses not to follow the expert's recommendations, its independent decision must be supported by competent evidence of record. *Nomland v. Nomland*, 813 A.2d 850, 854 (Pa.Super.2002) (citations omitted). Herein, Father's arguments to the contrary, the trial court accepted Dr. Clawar's recommendation that the family needs to participate in reunification therapy and imposed restrictions on Father's periods of partial custody based not only upon the trial testimony of the guardian *ad litem*, but also upon its consideration of the custody factors. Specifically, the trial court observed:

[Father] assigns various related errors in the grant of primary physical custody to [Mother], the weight afforded to the preferences of the children and the limits on his periods of custody. [Father] asserts the court found none of the custody factors to be in [Mother's] favor. Several of the custody factors, including numbers (1), (3), (5) and (11) through (15) favor neither party. These factors either reflect equally unfavorably on each party, as is the case with factors (1) and (13), are equally balanced, as is the case with factors (11) and (12) or are not applicable to either party as is the case with factors (14) and (15). Other factors, specifically (2) and (2.1) were the subject of extensive testimony.

The court did not find that either party committed acts of physical abuse. In doing so the court considered and noted the results of the various allegations against [F]ather including the summary harassment charge (of which he was acquitted) and the Child Protective Services (which were ultimately unfounded). Several other factors, for reasons presented in the Opinion, clearly favored [Mother] having primary physical custody, these included factors (4), (6), (7), (9) and (10). These particular factors were also given the greatest weight due to the significance they have in supporting both the immediate and long-term best interests of the children. Specifically, as to factors (9) and (10) [Father] entirely dismisses any possible need for mental health services for the children despite the testimony of professionals and the stated desire for the same by the older two children. [Father] expressed the same disdain and disregard for educational services provided for the children, despite his limited involvement in the same during the last several years. Perhaps more importantly for his immediate relationship and care of the children [Father] totally rejects any responsibility for the clearly expressed fear his children have of him and instead attributes everything to [Mother]. In considering the entirety of the evidence the court finds this assertion is simply not credible. [Father] asserts error to the weight given to the preference of the children. The testimony of each child reflects the clear preference of each to reside with their mother. As stated in its opinion, the court gave considerable weight, particularly as to the two older children, to this preference for the reasons given. The court also granted the older children, who consistently and credibly express a fear of [Father], great latitude in attending or not attending visits with their father. The testimony of these children indicates, credibly, that [Father] dismisses or ignores their expressed fears and concerns as well as, at least in the case of the oldest child, her

very presence at some periods of custody. As discussed below, attendance at and participation in reunification therapy is not optional for the children nor either parent. The length, frequency and conditions of [Father's] periods of custody would all be subject to modification as progress is made in the reunification process.

[Father] asserts various errors related to the evaluation and testimony of Dr. Stanley Clawar. The first of these errors is that the court erred in "not properly considering, weighing or adopting the uncontroverted evidence or recommendations provided by the case's only expert, Dr. Stanley Clawar." This broad allegation of error does not identify any specific findings or recommendations allegedly not considered or adopted. There have been assertions presented that Dr. Clawar was a neutral evaluator or witness. The record simply does not support this, Dr. Clawar was sought out, retained and paid by [Father]. Dr. Clawar testified at length regarding his evaluation and the process and carefully distinguished that he conducted a forensic evaluation and was not a clinical provider to any of children or either party. **The court did in fact adopt what it determined to be the most important recommendation by requiring the parties and children engage in immediate reunification therapy. The court further directed that [Father] was authorized to select a qualified professional and that [Mother] was required to cooperate and participate**.

\*\*\*

[Father] further asserts as error the court "making no finding and supplying no remedy or sanction regarding Mother's alienation and undermining of Father's relationship with the children." [Father] is correct that the court made no specific finding of alienation, however, the court did find that both parents had failed to meaningfully support the relation of the other parent. The court found and noted that [Father's] relationship with the children had been negatively impacted and that [M]other was, in part, responsible for the eroded relationship. [Father] however is also, in part, at fault for the present condition of his relationship with the children. The court noted and adopted as a remedy a requirement that the parties and children immediately begin reunification therapy. This remedy was suggested and deemed essential by Dr. Clawar. This requirement is foundational to the preservation and strengthening of the relationship between [Father] and his children. [Father] is further correct that the court imposed no sanction upon Mother. A primary focus and purpose

- 25 -

in a custody trial is to address the best interests of the children at the center of it. A custody trial is not intended to be a mechanism by which one parent, through the court, punishes or exacts retribution upon the other parent. Should [Mother] refuse to participate and cooperate or require the children to participate and cooperate in reunification therapy or any other way disregard the Order, [Father] may, of course, seek enforcement through means including contempt.

\*\*\*

[Father] presents two allegations of error related to the guardian *ad litem*. Specifically, it is noted that the report of the guardian *ad litem* was not filed. A review of the docket reveals this is factually correct, while a report was prepared and circulated it was never made part of the record. The guardian *ad litem* was present for the entire trial and testified. The second allegation of error asserts "[t]he trial court erred and abused its discretion by deferring to, considering or adopting a recommendation or position of the guardian ad litem given the evidence of record and the failure of the guardian *ad litem* to conduct a proper investigation and interviews." This allegation identifies no recommendation or position nor specific failure by the guardian ad litem during her appointment. As noted above, the guardian *ad litem* testified during the custody trial and the court considered this along with all other evidence presented in making the determinations it did.

Supplemental Opinion Pursuant to Pa.R.A.P. 1925, filed 3/2/22, at 1-4 (unnumbered) (emphasis added).

Upon our review of the record, aware of and applying the deference this Court must give to the credibility determinations of the trial court, we accept the trial court's conclusion that Father's custody must remain supervised and that B.H. and M.H. have the ability to opt out of custodial time with him until such time as progress is made in the reunification process. While the record does not point to specific acts of physical harm which may result if the custody arrangement for B.H. and M.H. is changed prior to the time the family

completes reunification therapy, it does suggest that the fragile mental health of these children may be adversely affected if they do not continue to have periods of supervised physical custody which they may opt out of with Father.

As mentioned above, the law does not require a certain amount of detail for a trial court's explanation to be sufficient, only that the court's decision is based on the enumerated custody factors. *D.Q. v. K.K.*, 241 A.3d 1112, 1118 (Pa.Super. 2020). Appellate interference is unwarranted so long as the trial court's considerations were careful and thorough. *A.V.*, 87 A.3d 818, 820 (Pa.Super. 2014).

We are cognizant that the Section 5328(a) analysis should not be viewed as a scorecard, for a party does not prevail simply because the trial court determines a majority of its factors favors him or her. In theory, any single factor be dispositive given the circumstances, so long as the record supports such a determination. *M.J.M. v. M.L.G.*, 63 A.3d at 339. ("It is within the trial court's purview as the finder of fact to determine which factors are the most salient and critical in each particular case.") (citation omitted).

The weight that a trial court attaches to the factors is critical, and the trial court's delineation of its reasons in support of its Custody Order herein evinces the manner in which it weighed those factors to lead it to limit Father to supervised physical custody of which B.H. and M.H. may opt out until, as per Dr. Clawar's recommendation, the parties cooperate and participate in

reunification therapy. Accordingly, we affirm the Custody Order of the trial court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/05/2022